863 F.2d 883
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Paul GALVAN, Plaintiff-Appellant,
v.
SECRETARY OF HEALTH & HUMAN SERVICES, Defendant-Appellee.
 No. 87-2237.
 United States Court of Appeals, Sixth Circuit.
 Dec. 9, 1988.
 
 Before DAVID A. NELSON and BOGGS, Circuit Judges, and GEORGE CLIFTON EDWARDS, Jr., Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Paul Galvan has appealed from a district court order granting summary judgment for the Secretary in a social security disability case. Believing that the Secretary's decision is supported by substantial evidence, we shall affirm the judgment of the district court.
 
 
 2
 Mr. Galvan is a 42-year-old high school graduate with a history of neck and back injuries. Following one such injury in 1979 he underwent a cervical decompressive laminectomy. Mr. Galvan's neurosurgeon, Dr. McGauley, opined that Mr. Galvan would be unable to return to heavy physical labor.
 
 
 3
 In February of 1981 Mr. Galvan was examined by a second neurosurgeon, Dr. Farhat, who noted that Mr. Galvan had "numbness in all his fingers." Mr. Galvan returned to Dr. McGauley complaining of increased pain in September of 1981, but the doctor did not believe that Mr. Galvan's condition was worse from a neurological standpoint.
 
 
 4
 In January of 1982 Neurologist John Segall examined Mr. Galvan and found "residual clonus and dysequilibrium [sic], secondary to the spinal-cord injury sustained prior to his condition being diagnosed." Although Dr. Segall reported that the patient was bothered by an occasional unsteadiness of gait, low back pain, and "some" neck pain, he considered Mr. Galvan to be "improved somewhat." Dr. Segall opined that Mr. Galvan was unable to perform heavy labor, but "[p]erhaps a lighter form of work would be much more acceptable."
 
 
 5
 In April of 1982 Dr. Segall wrote that Mr. Galvan could not be employed as a general laborer on account of his "slow and incomplete recovery of his rather significant neurological deficit." Dr. Segall also observed that Mr. Galvan still had partial paralysis in his arms and legs. In May of 1982 Dr. Segall observed that Mr. Galvan could walk a quarter of a mile without "too much hassle" and could stand without difficulty. He indicated that Mr. Galvan's grip strength was good and that Mr. Galvan could button clothing, tie shoes, and pick up a pen and write. He found Mr. Galvan to be strong but uncoordinated, and reported that Mr. Galvan's problem wasn't progressive.
 
 On October 25, 1982, Dr. Segall wrote
 
 6
 "[t]he patient has improved significantly. I find very little in the way of neurologic deficit at this time. I hope Mr. Galvan is able to secure either retraining or a good-paying job. I find no major neurologic handicaps at this point."
 
 
 7
 At that time Mr. Galvan was reporting occasional headaches and numbness in his hands.
 
 
 8
 Neurologist Allan Clague examined Mr. Galvan on two occasions in 1983 at the behest of the Michigan Vocational Rehabilitation Service. In July of 1983 Dr. Clague wrote that Mr. Galvan's symptoms included "dizzy spells, blackouts, and falling down episodes." Mr. Galvan also reported to Dr. Clague that he had bad headaches that had been growing progressively worse during the preceding three months. Dr. Clague found no gross motor weakness, although sensory testing revealed reduced sensitivity to pin prick throughout. Dr. Clague reexamined Mr. Galvan in October of 1983 and wrote:
 
 
 9
 "Mr. Galvan has positive neurological signs of cervical spondylosis with spinal cord compression and his neurological examination at this time does not vary greatly from that recorded by Dr. McGauley back on September 18, 1981. Therefore, I find no evidence to suggest that this is progressive or that he is having further neurologic compression of his spinal cord.
 
 
 10
 * * *
 
 
 11
 * * *
 
 
 12
 In regards to his work or rehabilitation status, it is certainly clear that he has neurological disability at this time which would limit his ability to perform certainly any type of sustained or heavy muscular function, although certainly light work would be very feasible. I would certainly see no reason why you could not place him in some type of light work which he could carry out and would tolerate. However, he should only work at ground level and should not operate heavy moving equipment."
 
 
 13
 In April of 1984 the Michigan Bureau of Rehabilitation referred Mr. Galvan to Dr. Claude Lowry for a neurologic evaluation. Dr. Lowry told the agency that Mr. Galvan's major complaint was of lower back pain and shaking legs. Mr. Galvan also complained of headaches and numbness "just about everywhere." Dr. Lowry's examination found no evidence of cranial nerve abnormalities and no evidence of poor coordination. Dr. Lowry thought Mr. Galvan's strength in his arms was "good and very likely normal." Although Mr. Galvan walked very slowly--as though he were in great pain--he was nonetheless able to squat and recover. Dr. Lowry found Mr. Galvan's condition to be very difficult to evaluate and suggested that psychiatric consultation might illuminate the extent to which Mr. Galvan's physical problems were "magnified by a psychogenic overlay." Subsequent examination by a psychiatrist revealed no serious psychological disturbances and led the psychiatrist to opine "I don't think he exaggerate[s] his symptoms."
 
 
 14
 In December of 1984, after a hearing, Administrative Law Judge Maurice Barbour found that Mr. Galvan was not under a disability as defined in the Social Security Act. The Appeals Council affirmed the ALJ's decision. An action was then filed in district court, but the court remanded the case to the Secretary for readjudication under revised mental impairment listings.
 
 
 15
 Pursuant to instructions from the Appeals Council, Administrative Law Judge Bruce King had Mr. Galvan examined by a psychologist and a psychiatrist. The psychologist opined that Mr. Galvan was depressed, and the psychiatrist observed that he was under "psychosocial stresses" resulting from his inability to obtain disability compensation.
 
 
 16
 Mr. Galvan obtained neurological evaluations from Drs. Alessi and Floberg of the University of Michigan Department of Neurosurgery. On April 11, 1985, Dr. Alessi wrote a letter stating that Mr. Galvan
 
 
 17
 "suffers from a spastic periparesis as a result of a cervical myelopathy in 1981. He is currently under our care and that of the Department of Neurosurgery. In our opinion he is not capable of gainful employment at this time."
 
 
 18
 In a report prepared on February 5, 1986, Dr. Floberg said that a myelogram revealed spurs at C5-T1 and root sleeve defects at C6-7. Based on his diagnosis and findings, Dr. Floberg stated that Mr. Galvan would require at least one 20-minute rest period per hour if he were to return to repetitive work activity. The doctor also indicated that Mr. Galvan needed to lie down for substantial periods during the day. Dr. Floberg advised against bending, lifting or overhead work, and said that Mr. Galvan could lift no more than five pounds. Standing and walking for up to two hours per day were permitted, and Dr. Floberg said that Mr. Galvan could tolerate sitting for twelve hours per day. Mr. Galvan's physical condition was stable, according to the doctor, but not remediable.
 
 
 19
 ALJ King convened an administrative hearing on September 17, 1986. The Secretary's medical advisor testified that Mr. Galvan's mental impairment imposed no functional limitations in terms of daily living and social functioning. The medical advisor considered Mr. Galvan's mental condition to be appropriate for someone who had been in pain for a number of years and was unable to provide for his family. He saw no evidence that Mr. Galvan was consciously malingering.
 
 
 20
 A vocational expert opined that if Mr. Galvan's testimony were accurate, there were no jobs he could perform. The vocational expert also said that there would be no jobs Mr. Galvan could perform if it were true, as Dr. Floberg indicated, that he required 20-minute rest periods every hour. But if Mr. Galvan's reported symptoms and Dr. Floberg's opinion were discounted, Mr. Galvan could perform many unskilled sedentary jobs, according to the expert.
 
 
 21
 Stressing the lack of any clinical evidence that Mr. Galvan's disease had progressed since 1981, ALJ King found that Mr. Galvan was not under a disability. The ALJ noted that in 1983 and 1984 Drs. Clague and Lowry found minimal neurologic impairments, and that in 1985 Dr. Alessi, who considered Mr. Galvan to be unable to work, wrote "[t]he myelopathy does not appear to be progressive at this time, yet his physical findings are unchanged since 1981."
 
 
 22
 In evaluating allegedly disabling complaints of pain, this court, following the analysis set forth in Duncan v. Secretary, 801 F.2d 847, 853 (6th Cir.1986), looks first for objective medical evidence of an underlying medical condition. It is not disputed that Mr. Galvan suffered from cervical myelopathy. In our opinion, however, it was open to the ALJ to find that the medical evidence does not confirm the severity of Mr. Galvan's complaints and does not show his cervical myelopathy to be of such a severity as could reasonably be expected to produce disabling pain.
 
 
 23
 Several of the examining doctors indicated that Mr. Galvan was able to work despite his myelopathy. Dr. McGauley thought that his patient was unable to return to "heavy physical labor" and could find no change in Mr. Galvan's neurological condition to explain his complaints of increased pain. Dr. Segall wrote "I do not consider him able to return to work that involves heavy labor. Perhaps a lighter form of work would be much more acceptable." Dr. Segall thought Galvan had "improved significantly" and had "very little in the way of a neurologic deficit." Dr. Clague considered the patient to be able to perform light work as long as it did not require a sustained or heavy muscular function. Significantly, despite their conclusion that Mr. Galvan was disabled, Drs. Alessi and Floberg found that his myelopathy had not grown worse since 1981 and was stable in 1986.
 
 
 24
 A "determination of disability must be made on the basis of the entire record and not on only some of the evidence to the exclusion of all other relevant evidence." Hardaway v. Secretary of Health and Human Services, 823 F.2d 922, 927 (6th Cir.1987). This is a close case, and the evidence is in conflict, but our review of the record has persuaded us that the decision of the Secretary is supported by substantial evidence. The judgment of the district court is therefore AFFIRMED.